**Andrew WILSON, Plaintiff,**

v.

**CITY OF CHICAGO, Richard Brzeczek, Jon Burge, Patrick O'Hara, and John Yucaitis, Defendants.**

**Jon BURGE, Defendant and Cross–Plaintiff,**

v.

**CITY OF CHICAGO, a Municipal Corporation, Defendant and Cross–Defendant.**

**No. 86 C 2360.**

United States District Court, N.D. Illinois, Eastern Division.

Oct. 3, 1995.

Andrew Wilson, Pontiac, IL, pro se.

John Ladell Stainthorp, People's Law Offices, Jonathan B. Gilbert, David Philip Schippers, Schippers, Gilbert & Bailey, Chrtd., Chicago, IL, for Andrew Wilson.

Arthur Mooradian, Kelly Raymond Welsh, Susan R. Lichtenstein, John F. McGuire, Michael A. Forti, Charles Wilfred Levesque, City of Chicago, Law Department, Corporation Counsel, Susan S. Sher, Corporation Counsel, City of Chicago, Chicago, IL, for City of Chicago.

William Joseph Kunkle, Jr., Jeffrey Mark Rubin, Phelan, Cahill, Devine & Quinlan, Ltd., Chicago, IL, David K. Greene, PNC Mortgage Corp. of America, Vernon Hills, IL, for Richard Brzeczek, Thomas McKenna, Officer Mulvaney.

Arthur Mooradian, Kelly Raymond Welsh, John F. McGuire, City of Chicago, Law Dept., Corp. Counsel, Chicago, IL, for James Reilly.

William Joseph Kunkle, Jr., Jeffrey Mark Rubin, Caesar A. Tabet, Phelan, Cahill, Devine & Quinlan, Ltd., Chicago, IL, David K. Greene, PNC Mtg. Corp. of America, Vernon Hills, IL, for John Burge.

William Joseph Kunkle, Jr., Jeffrey Mark Rubin, Caesar A. Tabet, Phelan, Cahill, Devine & Quinlan, Lawrence Dominic O'Gara, Attorney at Law, Chicago, IL, David K. Greene, PNC Mtg. Corp. of America, Vernon Hills, IL, for Patrick O'Hara.

William Joseph Kunkle, Jr., Jeffrey Mark Rubin, Caesar A. Tabet, Phelan, Cahill, Devine & Quinlan, Chicago, IL, Joseph Vincent Roddy, Law Office of Joseph V. Roddy, Chicago, IL, David K. Greene, PNC Mtg. Corp. of America, Vernon Hills, IL, for John Yucaitis.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

Plaintiff Andrew Wilson brings this action for damages pursuant to 42 U.S.C. § 1983 and state law against Jon Burge, Patrick O'Hara and John Yucaitis (the "Officers"), alleging that they tortured him to force him to confess to the murder of two Chicago police officers. In his Second Amended Complaint, plaintiff added the City of Chicago (the "City"), alleging that the City is liable, pursuant to the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/9–102 ("the Tort Immunity Act"), for any judgment or settlement he receives.

The Officers have cross-claimed against the City based on the same state statute, also alleging that the City is liable for any judgment entered against them or settlement paid to plaintiff as a result of his claims against the Officers.

The court has jurisdiction of plaintiff's underlying federal action against the Officers pursuant to 28 U.S.C. § 1331 and § 1343(a)(3). On January 5, 1995, the court ruled that it had jurisdiction over plaintiff's and the Officers' claims against the City under the doctrine of supplemental jurisdiction as codified in 28 U.S.C. § 1367.

The City has moved for reconsideration of that decision, or in the alternative to bar plaintiff's indemnity claims against it based on *res judicata*. Plaintiff has moved for partial summary judgment on Count I against the City asking the court to hold as a matter of law that the Officers were acting within the scope of their employment when they committed the alleged acts of abuse. Plaintiff has also moved for summary judgment against the Officers, based on the collateral estoppel effect of a Police Board hearing. Finally, plaintiff has moved to strike the City's second affirmative defense, which asserts that the Tort Immunity Act does not apply to the City because it is a home rule unit.

For the reasons set forth below, the City's motion for reconsideration is denied, and plaintiff's motions to strike the City's second affirmative defense, and for partial summary judgment against the City and the Officers are granted.

*FACTS*

On February 14, 1982, plaintiff was arrested for the murder of two Chicago police officers. After his arrest, plaintiff claims that the Officers beat and tortured him into confessing to the crime. The state ultimately tried and convicted him, but an appeals court reversed the conviction because the confession was ruled involuntary. He was subsequently retried and convicted and is now serving a life sentence.

In 1986, plaintiff brought this action against the City and the Officers pursuant to 42 U.S.C § 1983. After an eight week trial ended in a hung jury, a second eight week trial resulted in a finding that plaintiff's constitutional rights had been violated, but not by the Officers. The jury found that the City had a *de facto* policy authorizing the police to physically abuse persons suspected of killing or injuring Chicago police officers. This policy, however, did not result in the direct and proximate cause of plaintiff's injuries. Based on this finding, the jury found in favor of all defendants. On appeal, the Seventh Circuit reversed the jury verdict for the Officers but affirmed the verdict for the City. The court of appeals then remanded the case to this court for a new trial as to the Officers only.

Throughout both trials, the City admitted that the Officers acted under the color of law and within the scope of their employment. By doing so, the City implicitly admitted that it would pay any judgment or settlement against the Officers pursuant to the Tort Immunity Act.

After the second verdict, the Chicago Police Department's Office of Professional Standards reopened the investigation into the conduct of the Officers. The City alleges that this re-opened investigation came about as a result of facts revealed at the second trial. Subsequently, then acting Superintendent LeRoy Martin brought formal charges against the Officers before the Chicago Police Board. The City prosecuted the action, taking the position that the Officers, while acting as Chicago police officers, physically abused and failed to prevent the abuse of plaintiff. The City also charged that the Officers failed to provide plaintiff with proper medical treatment for the injuries he sustained while in their custody. From February 10, 1992, until March 20, 1992, the Board, acting as an administrative agency in a judicial capacity, held hearings on alleged violations of Chicago Police Department rules by the Officers. At those hearings, the Officers were represented by counsel, who presented evidence and cross-examined witnesses.

On February 11, 1993, the Board issued its decision, finding all three Officers guilty of misconduct. Specifically, the Board found Burge guilty of violating eight Chicago Police Department rules, including: (1) physical abuse of plaintiff; (2) knowledge that other Officers abused plaintiff, but failed to take action to stop the mistreatment; and (3) failure to provide proper medical care for plaintiff. Additionally, the Board found the

other two Officers guilty of failure to stop or report the abuse, and failure to get medical attention for plaintiff. The City suspended Yucaitis and O'Hara for fifteen months and fired Burge. The Board's decision was affirmed by the Circuit Court of Cook County on administrative review. That decision is now on appeal before the Illinois Appellate Court.

In March 1994, allegedly as a result of the Police Board's findings, the City changed its long-held position in the instant case that the Officers' actions fell within the scope of their employment. As a result of this change, the City decided it would not indemnify the Officers for any settlement or judgment against them.

By letter to Burge's counsel dated March 28, 1994, the City confirmed that it was: (1) repudiating its original affirmation in its answer that the Officers acted within the scope of their employment; and (2) denying indemnification for any damages or settlement with or without an admission of liability or willful misconduct. In response to the City's change in position, plaintiff and the Officers asked for and were granted leave to file a Second Amended Complaint and Cross Claim asserting their respective claims under the Tort Immunity Act. The City moved to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), which motion was denied by this court. *Wilson*, 1995 WL 1290 (N.D.Ill.1995).

### *Motion for Reconsideration*

The City has now filed a motion requesting that the court reconsider its January 5, 1995, decision denying the City's motion to dismiss the state law indemnity claims based on lack of supplemental jurisdiction, or in the alternative, for the court to hold that the indemnity claims are barred by the doctrine of *res judicata*. For the reasons set forth below, the City's motion is denied.

First, the City has brought its motion to reconsider under Fed.R.Civ.P. 60(b) which, as plaintiff points out, applies only to final judgments. Because the court's denial of the City's motion to dismiss is obviously not a final judgment, Rule 60(b) is inapplicable. Moreover, and more importantly, in its January 5, 1995, opinion, this court fully set forth

why it has supplemental jurisdiction of plaintiff's and the Officers' state law claims. The City has presented nothing new to persuade this court that its previous decision was erroneous. The case on which the City relies, *Herrmann v. Cencom Cable Associates, Inc.*, 999 F.2d 223 (7th Cir.1993), is so inapposite factually that it lends no support to the City's position. Accordingly, for the reasons set forth above and in the court's January 5, 1995, opinion, the City's motion for reconsideration is denied.

More interesting, but equally unavailing, is the City's position that if the court is correct that the state law claims arise out of a common nucleus of facts as the plaintiff's Section 1983 claim against the Officers, then his state law claims against the City are barred by *res judicata* because he failed to raise them against the City in his initial suit. Under the federal common law doctrine of *res judicata*, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. *Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589, 593 (7th Cir.1986). *Res judicata* applies when there is: (1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and later suit; and (3) an identity of parties or privies in the two suits. *Brown v. J.I. Case Co.*, 813 F.2d 848, 854 (7th Cir.1987), *cert. denied*, 484 U.S. 912, 108 S.Ct. 258, 98 L.Ed.2d 215 (1987).

There is no dispute as to two of the three conditions in the instant case. Clearly, a final decision was reached by the Seventh Circuit in the City's favor on the *Monell* claim, the only claim originally advanced against the City by plaintiff. *Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir.1993). Thus there is a final judgment on the merits and an identity of parties or privies. The issue thus becomes whether there is an identity of the cause of action decided in the initial suit and that raised by the plaintiff in his amended complaint.

To establish that an identity exists between the *Monell* cause of action raised against the City initially and the current state law claim for indemnification, the City

argues for application of the "same transaction" test. See *Petit v. City of Chicago*, 766 F.Supp. 607, 611 (7th Cir.1991). Under this test, "a cause of action consists of a single core of operative facts which give rise to a remedy." *Alexander v. Chicago Park District*, 773 F.2d 850, 854 (7th Cir.1985). The City then argues that because this court has already held that the state law indemnity claims arise out of the same common nucleus of operative facts as plaintiff's Section 1983 claim against the Officers (the alleged police misconduct), it has also determined that an identity of causes of action is established.

■ This argument has two fundamental flaws. First, it presumes that a finding that one claim arises out of the same facts as another "federal" claim for jurisdictional purposes, means also that they are in fact the same "cause of action" for *res judicata* purposes. This is not necessarily true, as evidenced by *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), in which the Supreme Court set forth the modern doctrine of pendent jurisdiction now codified by Section 1367. In *Gibbs*, the court examined the old rule for pendent jurisdiction established by *Hurn v. Oursler*, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). *Hurn* held that in a case where two distinct grounds in support of a single cause of action are alleged, one of which raises a federal question that is not plainly wanting in substance, a federal court can retain and dispose of the case on the state ground, even if the federal ground is not established. In a case where two separate and distinct causes of action were alleged, however, only one of which was federal, a federal court under *Hurn* was not permitted to rule on the nonfederal cause of action. The *Gibbs* court noted that *Hurn* was decided prior to the adoption of the Federal Rules of Civil Procedure, and that the definition of a "cause of action" was subject to serious dispute. *Gibbs*, 383 U.S. at 722, 86 S.Ct. at 1137. It could mean one thing for one purpose, and something different for another. *Id.* *Hurn* defined the term "cause of action" by looking to *res judicata* cases (*Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069 (1927)), and defined it as one actionable wrong creating one recovery. The *Gibbs*

court assumed that, had the *Hurn* court found a jurisdictional bar to hearing the state claim, *res judicata* would not be applicable to that claim.

*Gibbs* rejected what it described as the unnecessarily grudging *Hurn* "cause of action" test for the now familiar common nucleus of operative fact test. The Court held that pendent jurisdiction, in the sense of judicial power to hear a case, exists whenever there is a claim "arising under the constitution, laws of the United States and treaties ... and the relationship between this claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case." *Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138. The Court specifically noted that the question of whether the joined state and federal claims constitute one case for jurisdictional purposes is to be distinguished from the equally difficult inquiry of whether any "case" at all is presented (i.e., whether there is federal question jurisdiction), although the issue of whether a case "arises under" federal law and the issue of whether the federal and state claims constitute one "case" for pendent jurisdiction purposes may often appear together. See *Dann v. Studebaker–Packard Corp.*, 288 F.2d 201, 211–15 (6th Cir.1961).

By rejecting *Hurn*, *Gibbs* held that a federal court could exercise pendent jurisdiction over a separate state cause of action, and that separate and distinct causes of action can comprise one case arising under the constitution or federal laws. Because of the then new Federal Rules of Civil Procedure, *Gibbs* spoke in terms of claims, not causes of action. As noted by the *Gibbs* court, one of the reasons for the use of the term "claim" in the Federal Rules is because of the problems encountered in defining the term "cause of action." *Gibbs*, 383 U.S. at 722–24, 86 S.Ct. at 1137–38.

Yet, cases seeking to apply the doctrine of *res judicata* continued to employ the phrase "cause of action" even as they were renaming the doctrine "claim preclusion." For example, *Car Carriers*, the 1986 Seventh Circuit case on which the City relies, states that under "*res judicata*, a final judgment on the

merits bars further claims by parties or their privies based on the same cause of action." 789 F.2d at 593 (citing *Brown v. Felsen,* 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979)). The "same transaction" test provides that a cause of action consists of a single core of operative facts which give rise to a remedy. Once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or be lost. *Id.* A mere change in legal theory does not create a new cause of action. *Id.* This sounds much like the definition of the term "claim for relief" as used under the Federal Rules. Prior to the Rules, *both* legal theory *and* facts made up a "cause of action." *NAACP v. American Family Mutual, Inc. Co.,* 978 F.2d 287, 291–92 (7th Cir.1992).

This court sees an inherent tension between the test for *res judicata* (a single core of operative facts which give rise to a remedy), and the test for a single constitutional case (two claims that derive from a common nucleus of operative fact). Under *Gibbs,* two separate and distinct causes of action can constitute one "constitutional case." *Res judicata* applies, however, only when there is identity of "causes of action." Yet, the test for each appears to be the same. The court concludes, therefore, that despite the similarity of language, a determination that a state law claim can be heard, as pendent to a federal claim because the two claims arise from a common nucleus of operative facts, is not tantamount to holding that they are the same cause of action for *res judicata* purposes.

■ This conclusion is buttressed by the fact that section 1367(a) provides for supplemental jurisdiction over not only pendent claims, but pendent parties as well, and section 1367(c) provides that in certain circumstances a district court may decline to exercise its power to hear a certain claim (e.g. if the claim involves a novel issue of state law). Under the City's position, if a district court declined to exercise jurisdiction over some claims but kept others, a race to judgment would result. This is unacceptable and unnecessary. Therefore, the court rejects the City's argument that this court has already decided that there is an identity of cause of

action between the federal claim and the state claim because of its prior decision on supplemental jurisdiction.

The City's position fails for a second, and perhaps even more fundamental, reason. In the January 5, 1995, opinion, this court held only that the state law indemnity claims derive from a common nucleus of fact with plaintiff's Section 1983 case against the Officers. That ruling was not difficult in light of the Seventh Circuit's ruling in *Argento v. Village of Melrose Park,* 838 F.2d 1483 (7th Cir.1988), and Judge Shadur's opinion in *Ellis v. Bankhead,* 828 F.Supp. 45 (N.D.Ill. 1993).

Contrary to the City's argument, however, this court has never held that the plaintiff's state law indemnity claims against the City arise from a common nucleus of fact with the plaintiff's now dismissed *Monell* claim against the City. As this court has already held, the facts from which the state law claims derive are the actions the officers took while arresting and interrogating plaintiff. The legal issue involved is whether both officers were acting within the scope of their official duties. While these facts might be relevant to the *Monell* claim, the facts from which that claim derives involve the City's policy or lack of policy of abusing and torturing individuals suspected of killing police officers—a much broader issue than the Officers' conduct toward plaintiff.

This difference in underlying fact is illustrated by the evidence presented by plaintiff in the second trial in this matter to establish City liability under *Monell.* Evidence was submitted that Richard Brzeczek, then Superintendent of Police, had received many complaints from blacks that officers in Area 2 were abusing suspects, and that such abuse was common. Evidence was presented to demonstrate that Brzeczek submitted those complaints to the office in the department responsible for investigating allegations of police misconduct, but the office did nothing. Brzeczek also wrote to inform the State's Attorney that Brzeczek would do nothing further unless he received assurance that doing something would not interfere with the prosecution of plaintiff. This evidence was presented to demonstrate Brzeczek's knowl-

edge, and to establish deliberate or reckless indifference to the complaints, in order to establish that the policy had been endorsed by, and therefore adopted by Brzeczek, the municipal policy maker. *Wilson v. City of Chicago,* 6 F.3d 1233, 1240 (7th Cir.1993).

These facts, which make up the core of the *Monell* claim and defense, are unnecessary to either the Section 1983 action or the state law indemnity claims against the City that are now in dispute. These claims depend only upon proving the police misconduct and whether that misconduct occurred within the scope of the Officers' duties, not whether the City had a policy or practice condoning or endorsing brutality. Simply put, the indemnity claims are not brought against the City for actions that the City took (as in the *Monell* claim), but rather for actions of its employees. Accordingly, the court concludes that plaintiff's state law claims against the City for indemnity do not arise from a common core of operative fact with the *Monell* claim, and that *res judicata* is inapplicable.

▪ This conclusion is consistent with the purpose of *res judicata,* a doctrine that insures the finality of decisions. It prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding. *Brown,* 442 U.S. at 131, 99 S.Ct. at 2209. *Res judicata* thus encourages a reliance on judicial decisions, bars vexatious litigation, and frees the courts to resolve other disputes. *Id.*

▪ Because *res judicata* may govern grounds and defenses not previously litigated, it blocks unexplored paths that may lead to the truth. For the sake of repose, it shields the fraud and the cheat as well as the honest person. It is to be invoked, therefore, only after careful inquiry. *Id.* at 132, 99 S.Ct. at 2210. As the Seventh Circuit has stated, it is a doctrine of finality and repose, designed to curb vexatious litigation, minimize costs, and promote judicial economy. *Grip–Pak v. Illinois Tool Works,* 694 F.2d

466 (7th Cir.1982). Application of the doctrine in the instant case would serve none of these interests.

Acceptance of the City's position would require every Section 1983 plaintiff in a police brutality case to bring his/her indemnity action in the same suit as the *Monell* claim, rather than waiting until receiving judgment against the primary actors. Under the City's theory, this should be so even when, as here, the City had judicially admitted that the Officers' actions were within the scope of employment, and that the City would be liable for any judgment against them. Rather than serving judicial economy, the City's theory would promote (indeed mandate) needless and expensive litigation. It would force plaintiffs to try their indemnity actions merely to protect themselves from a possible change in position by a city. It would require every plaintiff with a *Monell* claim to bring its indemnity action before the liability of the primary actor has been established. In the instant case, it is only because the City changed its position after receiving its judgment that state law indemnity liability became an issue, and "it would hardly promote confidence in judgments to prevent [plaintiff] from meeting the City's new initiative." *Brown v. Felsen,* 442 U.S. at 133–34, 99 S.Ct. at 2210–11.

Accordingly, the court concludes that the interest protected by the doctrine of *res judicata* would not be served by its application to the instant case. The City's motion for reconsideration of the court's January 5, 1995, opinion is therefore denied.

### MOTION TO STRIKE AFFIRMATIVE DEFENSE

Plaintiff has moved, pursuant to Fed. R.Civ.P. 12(f), to strike the City's second affirmative defense, arguing that the defense fails as a matter of law.[1] For the reasons set forth the motion is granted.

▪ Motions to strike affirmative defenses are disfavored. They will be granted only

---

1. Although plaintiff's motion to strike was filed a few days beyond the time allowed by Fed. R.Civ.P. 12(f), the court will exercise its discretion to decide the sufficiency of the affirmative defenses at this stage of the proceedings. *See Williams v. Jader Fuel Co.,* 944 F.2d 1388 (7th Cir.1991).

when the defense is insufficient on the face of the pleadings, and it appears to a certainty that plaintiff would succeed despite any statement of the facts that could be proved in support of the defense. *Williams v. Jader Fuel Co., Inc.,* 944 F.2d 1388, 1400 (7th Cir. 1991).

The City's second affirmative defense asserts that plaintiff's Tort Immunity Act indemnity claim against the City is deficient as a matter of law. Specifically, the City asserts that even if this court finds that the Officers' actions were within the scope of their employment, the City still would not be liable for any judgment because section 9–102 of the Act is not applicable to it. The City argues that because it is a home rule municipality pursuant to Article VII, Section 6 of the Constitution of the State of Illinois, its legislative actions preempt any conflicting state statute that was not specifically adopted to limit the exercise of home rule. Therefore, the City argues that Section 2–60–020 of the Chicago Municipal Code preempts section 9–102 of the Tort Immunity Act. The court is unpersuaded.

Section 2–60–020 of the Municipal Code provides:

> When a judgment is rendered against any member of the Police Department for injury to a person or property resulting from the performance of his duties as a policeman he [the corporation counsel] shall certify such a judgment to the City Comptroller for payment by the City when, in his opinion, such member of the Police Department has not been guilty of willful misconduct. . . .

As is apparent from the quoted section, the City has determined that the corporation counsel shall certify for payment only those judgments against police officers who, in the corporation counsel's opinion, has not been guilty of willful misconduct. In contrast, by enacting section 9–102 of the Tort Immunity Act, the Illinois General Assembly has directed that a local public entity is both empowered and *directed* to pay any judgment or settlement for compensatory damages for which it or any employee, while acting within the scope of his or her employment, is liable.

745 ILCS 10/9–102 (formerly Ill.Rev.Stat. Ch. 85, ¶ 9–102) (emphasis added).

■ This court has already determined that section 9–102 makes a local public entity directly liable for the payment of certain tort judgments against its employees. *Wilson,* 1995 WL 1290. Therefore, if the Officers are found liable for conduct within the scope of their employment, the City is directly liable for any judgment. Article VII, Section 4 of the 1970 Illinois Constitution abolished sovereign immunity. Courts have thus held that municipal liability is an issue reserved for the Illinois General Assembly, not an issue subject to home rule. See *McLorn v. The City of East St. Louis,* 105 Ill.App.3d 148, 61 Ill.Dec. 107, 434 N.E.2d 44 (5th Dist.1982). Powers of a home rule unit relate only to its own affairs, not those of the state. *Ampersand Inc. v. Finley,* 61 Ill.2d 537, 542, 338 N.E.2d 15 (1975). Moreover, the power over a municipality's immunity and liability is vested solely in the General Assembly, and sovereign immunity does not apply to a home rule unit's government and affairs. *DeBow v. City of East St. Louis,* 228 Ill.App.3d 437, 170 Ill.Dec. 457, 592 N.E.2d 1137 (5th Dist.1992).

■ To the extent that Section 2–60–020 of the Chicago Municipal Code is inconsistent with Section 9–102 of the Tort Immunity Act, its effect is to limit the City's liability for the torts of its employees to acts that were not, in the corporation counsel's opinion, willful misconduct. That is the whole basis of the City's defense, but even a home rule unit such as the City does not have that authority under the Illinois Constitution. Accordingly, the City's defense fails as a matter of law, and the Officers' motion to strike is granted.

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST THE OFFICERS

Plaintiff argues that the Officers should be collaterally estopped from contesting the factual findings and legal conclusions made by the Chicago Police Board (the "Board") in the disciplinary hearing against the Officers. Based on those factual findings and the Officers' admissions that they were acting under

the color of law, plaintiff moves for summary judgment against the Officers on Count I for excessive use of force (Officer Burge), failure to prevent abuse (all Officers), and failure to provide prompt medical attention (all Officers).

In *University of Tennessee v. Elliott*, 478 U.S. 788, 799, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986), the Supreme Court stated: "When a State agency acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the State's courts." Thus, to determine if this court can give any preclusive effect to the Board's decision, it must first determine: (1) whether the Board acted in a judicial capacity; (2) whether the Officers had an adequate opportunity to litigate the issues before the Board; and (3) whether the Board's decision would be given preclusive effect by the Illinois courts. In addition, if those three factors are met, the court must then determine whether this particular Board decision should be given preclusive effect. See *Ray v. Indiana & Michigan Electric Co.*, 758 F.2d 1148, 1150 (7th Cir.1985).

In the instant case, the Board clearly acted in a judicial capacity. Administrative agencies act in judicial capacity and their determinations are entitled to preclusive effect when the procedures entail the essential elements of an adjudication. Those elements include: (1) adequate notice; (2) right of the parties to present evidence on their own behalf, and to rebut evidence presented by the opposition; (3) a formulation of issues of law and fact; (4) a final decision; and (5) the procedural elements necessary to determine conclusively the issues in question. *Crot v. Byrne*, 646 F.Supp. 1245, 1255 (N.D.Ill.1986), aff'd 957 F.2d 394 (7th Cir.1992).

All of these factors have been met in the instant case. The Officers received over three months' notice of the action before the Board. Charges were filed on November 10, 1991, and the hearing began on February 10, 1992. All of the Officers were represented by counsel of their own choice, they presented evidence, and called and cross-examined witnesses. The Board issued findings setting forth its factual and legal conclusions in issuing a final decision. Finally, the decision of the Board completes all administrative action, and is conclusive absent a timely suit for judicial review. These procedures clearly constitute an administrative adjudication, and this court has no doubt that they constituted a full and fair hearing. See *Crot*, 646 F.Supp. at 1256.

Having found that the Board resolved the issues of fact properly before it and that the Officers had an adequate opportunity to litigate, this court must determine to what extent Illinois courts would give preclusive effect to the Board's determination. Plaintiff argues, and it is basically undisputed, that Illinois courts give preclusive effect to decisions of administrative agencies. See *Crot*, *Godare v. Sterling Steel Casting Co.*, 103 Ill.App.3d 46, 58 Ill.Dec. 588, 430 N.E.2d 620 (5th Dist.1987). The Officers argue, however, that in this instance the Illinois courts would not give preclusive effect because there is no "final judgment on the merits" because Illinois law requires that all potential appeals be exhausted before collateral estoppel can apply. *Ballweg v. City of Springfield*, 114 Ill.2d 107, 113, 102 Ill.Dec. 360, 499 N.E.2d 1373 (1986). Plaintiff counters, citing *Crot*, that while defendants' position might be true as to court decisions (although that, too, is in doubt, as discussed below), with respect to agency decisions, the *res judicata* effect affixes to the administrative determination rather than to that of a reviewing court.

Both parties have oversimplified the issue. It is generally true that the *res judicata* effect usually affixes to the administrative decision rather than the reviewing court's decision. *Godare*, 103 Ill.App.3d at 50, 58 Ill.Dec. 588, 430 N.E.2d 620. If there is any discrepancy between the court and the administrative decision, however, the *res judicata* effect affixes to the reviewing court's decision. The reviewing court's judgment, therefore, is *res judicata* to all issues raised before it, and all issues which could have been raised on the record but were not are deemed waived. *Edwards v. City of Quincy*,

124 Ill.App.3d 1004, 80 Ill.Dec. 142, 464 N.E.2d 1125 (4th Dist.1984).

Because the Circuit Court of Cook County, acting as the reviewing court, affirmed all of the Board's decision, including its factual findings, it would appear that preclusive effect should attach to the Board's decision, and this court should give that decision whatever effect the Illinois courts would give it. That, however, is no easy task, because the decision of the Circuit Court has been appealed to the Illinois Appellate Court. Plaintiff argues that preclusive effect is given to the administrative decision regardless of any pending appeal. Most states do give decisions of the court of first instance preclusive effect, whether or not the losing party has taken an appeal, and Illinois may be one such state. See, *State Life Insurance Co. v. Board of Education*, 401 Ill. 252, 257, 81 N.E.2d 877 (1948); *Kurek v. Pleasure Driveway and Park District*, 557 F.2d 580, 595 (7th Cir.1977) (concluding that Illinois follows the majority rule, which also is the rule for federal judgments).

The Officers contend, however, that the filing of an appeal suspends the collateral estoppel effect of a judgment. This argument is not without some merit in light of the Illinois Supreme Court's decision in *Ballweg*, which so held without any discussion of its decision in *State Life Insurance Co.* As noted by Judge Easterbrook in *Rogers v. Desiderio*, 58 F.3d 299 (7th Cir.1995), since *Ballweg* was decided, the state's intermediate appellate courts have been all over the board, some following *State Life Insurance Co.*, and others following *Ballweg*. This court finds Judge Easterbrook's assessment particularly appropriate here: "To be blunt, we have no idea what the law of Illinois is on the question of whether a pending appeal destroys the claimed preclusive effect of a judgment." *Id.* at 302. The law appears to be equally confused as to issue preclusion. *Id.* In *Desiderio*, Judge Easterbrook suggested that the best course for a federal court is to stay the federal action until the state court has decided the appeals. This court agrees.

■ Having determined that the Illinois courts would give preclusive effect to the Board's decision if affirmed on appeal, this court must decide if preclusion in this action is appropriate. For a party to invoke collateral estoppel, four conditions must be met: (1) final determination on the merits has been reached; (2) the issues for which estoppel was sought were essential to that decision; (3) the party against whom estoppel is invoked had a full opportunity to address the issues in the case; and (4) the issues were identical to the issues in the case in which estoppel was sought. *Ray v. Indiana & Michigan Electric Co.*, 758 F.2d 1148, 1150 (7th Cir.1985).

■ First, because this court has already determined that the application of any preclusive effect will be stayed until the appeals have been exhausted, the element of finality is or will be satisfied. Second, the issue for which estoppel is sought—whether the Officers physically abused plaintiff, or failed to prevent abuse—was unquestionably essential to the Board's decision.

The Officers assert, however, that the Board's decision is too vague to determine exactly what factual issues were actually decided, whether the issues decided were essential to its decision, and whether those issues are identical to the issues in the instant case. They argue that because the Board's decision contains such language as "and/or," there is a question as to what specific conduct the Officers were found to have engaged in. The court disagrees. The findings of the Board provide that Burge did: (1) "strike and/or kick and/or otherwise physically abuse or maltreat [plaintiff] ... and/or cause or aggravate physical or injuries to the person of [plaintiff]"; (2) "after having knowledge or reasonable basis to believe that other police officers ... were physically abusing or maltreating [plaintiff] ... improperly fail to take any action to stop such physical abuse or maltreatment ..." The findings are equally specific as to Yucaitis and O'Hara with respect to their knowledge of and failure to prevent such abuse or provide for or secure medical care for plaintiff. The court concludes that such findings are sufficiently specific for purposes of collateral estoppel.

Third, as noted above, the Officers had a full and fair opportunity to litigate the issues. As determined by the administrative reviewing court, the procedures before the Board satisfied due process. The Officers had the opportunity to call and cross-examine witnesses. They complain now that they were not allowed discovery before the Police Board, but they had already had the benefit of the discovery in the civil rights actions in this court, as well as having gone through two trials. They knew all the evidence against them, and were prepared to confront it.

Fourth, it is obvious that the issues before the Police Board are identical to the issues in this case. Those issues are whether the Officers physically abused plaintiff and/or failed to prevent such abuse. The Officers argue that Judge Shadur has already ruled that the issues in the Police Board matter differ from those in this civil rights action. When the Board action was first initiated, the Officers filed suit in federal court to enjoin it based on the collateral estoppel effect of the earlier judgment in the instant case. Judge Shadur refused to apply collateral estoppel, holding that: (1) the Board was an independent body not in privity with the City; (2) material evidence against the Officers was not admitted into evidence in the civil rights trials, and the City had no incentive to argue for its admissibility at that time; and (3) public interest in weeding out lawlessness in the police force overrides any of the Officers' arguments. Thus, Judge Shadur clearly did not rule that the issues were not identical in the two suits, but rather that the necessary identity of parties or privity was not present. Such is not the case under the present circumstances.

Finally, the Officers have set forth three additional reasons that they contend prevent the application of collateral estoppel even if all of the necessary requirements are present: (1) the Police Board has already determined that the issues before it were not the same issues as presented in the Section 1983 litigation, and thus collateral estoppel should not apply; (2) Judge Duff has already denied plaintiff's motion for non-mutual collateral estoppel in this case; and (3) application

would be fundamentally unfair. The court finds all of these arguments to be without merit.

The Officers moved to dismiss the charges in the Board based on collateral estoppel, claiming that the same issues had been determined adversely to the superintendent's position in the earlier judgment in this case. The Board refused to give the judgment preclusive effect because: (1) the case was on appeal to the Seventh Circuit (which ultimately reversed and remanded); (2) the City did not have incentive in the Section 1983 lawsuit to litigate the issue of whether the Officers abused plaintiff; and (3) the issues presented in the Police Board disciplinary action and those in the Section 1983 damage action were different. The Board held that because the City defended the civil rights suit on only the *Monell* charge, the only issue litigated by the City was whether it had a *de facto* policy of abuse. The City did not have a full opportunity to litigate the issue of whether the Officers engaged in physical abuse of plaintiff.

In concluding that the issues in the two proceedings were different, the Board cited *Adams v. Sotirakis,* 1991 WL 140914 (N.D.Ill.1991), in which Judge Kocoras held that the purposes of a disciplinary proceeding and a Section 1983 suit are different. *Adams,* however, is inapposite to the instant case. In *Adams,* a plaintiff filed a complaint in the Circuit Court of Cook County alleging civil battery against a police officer. He also filed charges against the officer with the Police & Fire Commission. Before the civil trial commenced, the Police & Fire Commission found the defendant officer not guilty on all charges that he abused the plaintiff. The officer then sought to dismiss the civil suit, which had been amended and removed to the this court, based on the collateral estoppel effect of the decision of the Police & Fire Commission. Judge Kocoras refused to apply collateral estoppel, noting first that the purposes of the two proceedings were different, and also holding that the plaintiff did not have a full and fair opportunity to litigate his claim in the Commission. Judge Kocoras found that the due process protections of the disciplinary proceeding were for the benefit

of the police officer only, not the complainant. In particular, he noted that the Commission rules provided for appeal by the police officer, but not by the complainant.

The instant case is quite different. Here, the procedural safeguards protected the Officers, and as already held, they did have a full and complete opportunity to litigate the issues. The rules provided for an appeal, and they did appeal and lost. Accordingly, this court concludes that the Board's decision not to apply collateral estoppel bears no impact upon the issue now before the court.

The Officers also assert that the use of offensive collateral estoppel should not be allowed now, because Judge Duff did not allow its use earlier in the litigation. As noted previously, plaintiff's initial conviction was overturned by the Illinois Supreme Court because the state had failed to prove that plaintiff's confession was not obtained by coercion, and thus was inadmissible. *People v. Wilson*, 116 Ill.2d 29, 41–42, 106 Ill.Dec. 771, 506 N.E.2d 571 (1987). Before Judge Duff, plaintiff sought to estop the Officers, based on the *People v. Wilson* decision, from relitigating the issues of his physical condition prior to his arrest, the time that he received his injuries after his arrest, and whether a statement that he gave was the product of coercion. Judge Duff refused to apply collateral estoppel because: (1) the defendant in the instant case (the Officers and the City) were not parties to nor privy with the actual party in the criminal case, the State; (2) the issue of whether plaintiff was beaten was not fully litigated in the criminal trial; and (3) the City and Officers did not have a "full and fair opportunity to litigate" the issues, and thus application of collateral estoppel would not comport with the requirements of due process.

Judge Duff's holding that plaintiff could not use offensive collateral estoppel based on the criminal trial in no way affects this court's decision in the instant matter. First, the Officers here were parties to and directly controlled their defense in the Police Board action. Second, the issues were fully and completely litigated, and the Officers had a full opportunity and strong incentive to present any evidentiary matters they thought relevant.

Finally, the Officers assert that this court must follow Illinois law, and that the Illinois Supreme Court has held against the use of offensive non-mutual collateral estoppel between a Section 1983 damage action and a Police Board disciplinary proceeding in *Van Milligan v. Board of Fire & Police Commissioners*, 158 Ill.2d 85, 196 Ill.Dec. 665, 630 N.E.2d 830 (1994), because to do so would be fundamentally unfair. The court disagrees.

In *Van Milligan*, the Illinois Supreme Court held that the factual findings made in a federal civil rights suit against a police officer would not be given offensive collateral estoppel effect in a subsequent disciplinary proceeding against the officer, even though it appeared that the threshold requirements of collateral estoppel might be satisfied. The court first defined offensive collateral estoppel as "when a plaintiff seeks to foreclose a defendant from litigating an issue a defendant had previously litigated unsuccessfully in another action." *Id.* at 93, 196 Ill.Dec. 665, 630 N.E.2d 830 (citing *In Re Owens*, 125 Ill.2d 390, 126 Ill.Dec. 563, 532 N.E.2d 248 (1988)). The court noted that it had previously counseled against "unrestricted" use of offensive collateral estoppel because its application permits a plaintiff to adopt a wait-and-see attitude during litigation of the first lawsuit in the hope that the action by another plaintiff will result in a favorable judgment. *Id.* at 95, 196 Ill.Dec. 665, 630 N.E.2d 830. The court further noted that if the defendant did not initially foresee the likelihood of later litigation involving the same subject matter, defendant would be placed in "a difficult predicament" if a second suit were commenced and if additional, or different liability were imposed in the second lawsuit. *Id.* (quoting *Owens*). Therefore, the court held that courts should be more cautious in applying offensive collateral estoppel than in applying defensive collateral estoppel.

Courts have broad discretion to ensure that application of collateral estoppel is not fundamentally unfair to the defendant, even if the threshold requirements have been met. Therefore, in *Van Milligan*, the court determined that it would be unfair to the officer to

apply collateral estoppel to prevent him from presenting a defense in the disciplinary hearing. The court reasoned that at the time of the trial, the officer did not have a sufficient interest in a civil rights hearing to fully and fairly litigate his case because the Police Department had indicated that it would not take disciplinary action against him.

Contrary to the Officers' assertion, *Van Milligan* does not hold that offensive collateral estoppel can never be used between a Section 1983 civil rights claim and a Police Board disciplinary hearing. *Van Milligan* merely held that such use should be restricted to instances where application of collateral estoppel would not be fundamentally unfair. Such is the case here. For all the reasons set forth above, the court has determined that it would not be fundamentally unfair to give preclusive effect to the decisions of the Police Board.

■ The court has determined that plaintiff is entitled to apply offensive collateral estoppel to prevent the Officers from relitigating the factual issues already decided in the Police Board hearing. Based on this decision, plaintiff could be granted summary judgment on Count I, as he requests. Because, however, the decision of the Police Board is still on appeal, this court will stay its decision on plaintiff's motion for summary judgment until the state court appeals are resolved.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST THE CITY

■ Finally, plaintiff has moved for summary judgment on the issue of scope of employment pursuant to Fed.R.Civ.P. 56(c). He argues that the court should determine, as a matter of law, that the Officers acted within the scope of their employment as police officers when they committed the alleged acts of brutality. Under the Tort Immunity Act, "[a] local public entity is empowered and directed to pay any tort judgment or settlement for which it or an employee while acting within the scope of employment is liable. . . ." Therefore, if the Officers were acting within the scope of their employment, the City is liable for any judgment obtained against them. Because the City has admit-

ted that the Officers engaged in the alleged conduct (City's Response at p. 6), for the purposes of this motion, the court will assume those allegations as fact.

Plaintiff raises two arguments: (1) the facts show that the Officers' actions fall within their scope of employment as Chicago police officers; and (2) the City is equitably estopped from denying its prior admission that the Officers were acting within the scope of their employment. Because the court agrees with plaintiff's first argument, it need not address the second issue.

Plaintiff argues that because the Officers acted while on duty, in uniform, and in the course of an official police investigation, their actions, as a matter of law, fall within the scope of their employment. Plaintiff asserts that based on this undisputed evidence the court should grant summary judgment on the issue of scope of employment. The City responds by arguing that: (1) a reasonable trier of fact could conclude the Officers' actions were outside the scope of their employment; (2) inferences derived from the facts of this case should be resolved by a jury; and (3) public policy favors a finding that the Officers acted outside the scope of their employment.

In *Coleman v. Smith,* 814 F.2d 1142, 1148 (7th Cir.1987), the district court refused to order the city to indemnify the defendant police officers under the Tort Immunity Act because of their "malicious" conduct in falsely arresting the plaintiff. The Seventh Circuit reversed, however, holding that the false arrest was within the officers' scope of employment, even though the real purpose in arresting the plaintiff was to hamper an investigation into police corruption. *Id.* at 1150. The court held that no bright line rule exists, but that actions fall within the scope of employment even if "an ulterior motive" exists, so long as the "relevant acts are shown to be a natural part of or incident to the service of the employment," and the defendants were not "acting (solely) as private individuals." *Id.* at 1149–50.

In a decision analogous to the instant case, the court found police abuse within the scope of employment, when police officers, while on

duty, administered a severe post-arrest beating to the plaintiff after he was arrested and taken to the police station. *Argento,* 838 F.2d 1483. After the plaintiff prevailed on his 42 U.S.C. § 1985 claim, both the plaintiff and the defendant police officers sought indemnification under the Tort Immunity Act. *Id.* The Seventh Circuit affirmed the district court's grant of a writ of mandamus compelling indemnification. *Id.*

The court in *Argento,* 838 F.2d at 1495 relied on the decisions in *Coleman* and *Hibma v. Odegaard,* 769 F.2d 1147 (7th Cir. 1985). In *Hibma* the actions of three police officers in framing plaintiff for three burglaries were found to be within in the scope of employment. 769 F.2d at 1153. The court held that the scope of employment includes actions that are so "closely connected with what the servant is employed to do, and so reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." *Id.* (quoting W. Prosser, *Law of Torts* § 70 at 460–1 (4th ed. 1980)).

In the instant case, the purpose of the Officer's beating of plaintiff, although improper, was incidental to their official duties and fulfilled their employer's objectives. The Officers' were in uniform, at the police station, and conducting an official police investigation when the beatings occurred. Despite any ulterior motives on the part of the Officers, their actions brought about the results expected by the City—the arrest and confession of plaintiff.

The City's argument that the extreme nature of the conduct pushes the Officers' actions outside the relevant scope of employment is without merit. Ulterior motives of the police, even if malicious and improper, do not change the objective determination of the scope of employment. *Graham v. Sauk Prairie Police Commission,* 915 F.2d 1085, 1095 (7th Cir.1990); *Hibma,* 769 F.2d at 1153; *Coleman,* 814 F.2d at 1150; *Bell v. City of Milwaukee,* 536 F.Supp. 462, 477 (E.D.Wis.1982).

In *Graham,* an on-duty police officer suffering from paranoid schizophrenia shot the plaintiff, who at the time was in handcuffs and did not pose a threat to the officer or anyone else. 915 F.2d at 1088. The court affirmed summary judgment granting indemnification of the police officer by the city under Wis.Stat. § 895.46, a statute analogous to Illinois Tort Immunity Act. *Id.* The court based its decision on the fact that the only reasonable inference that could be made was that the officers were acting within the scope of their employment. *Id.* at 1095–96. The court ruled that the shooting of the plaintiff, although inappropriate, was a method the police used to carry out their job. *Id.* at 1095. Therefore, the misconduct was within the scope of employment as a matter of law because a jury could not reasonably have inferred that the officer acted outside the scope of his employment. *Id.*

In its analysis, the *Graham* court stressed the fact that the officer, as in the instant case, was on duty, in uniform, and encountered the plaintiff only as a result of conducting official police business. *Id.* The focus of the test must be on "the services contemplated, not the outcome" of the conduct. *Id.* So long as the police, even if unintended, were working to further the objectives of their employer their actions fall within the scope of employment. *Id.; Hibma,* 769 F.2d at 1152. The court stated that summary judgment would be inappropriate only if there was evidence that the police officer had used his position as a pretext for some other ulterior motive "wholly disconnected" from his job as a peace officer. *Id.* at 1094.

Similarly, in *Bell v. City of Milwaukee,* 536 F.Supp. 462, 478 (E.D.Wis.1982), aff'd in part and rev'd in part, 746 F.2d 1205 (7th Cir. 1984), the defendant police officer tried to conceal his wrongful shooting of the plaintiff. The court required the city to indemnify the police officer under Wis.State. § 895.46, without submitting the scope of employment issue to a jury. *Id.* at 477. The court held that even if an ulterior objective existed, the officer was still within his scope of employment so long as he was acting to further his official police duties. *Id.* at 477–78. The court held that because the police officer's actions occurred as part of an official police investigation, they were "unquestionably" within the scope of employment even though he acted improperly. *Id.* at 478.

In the instant case, although the Officers clearly acted in an extreme and outrageous manner, the Officers' actions undoubtedly fell within the scope of their employment as Chicago police officers because: (1) they acted while on duty, in uniform, and in the course of an official police investigation; (2) their actions significantly served the objective of their employer—to arrest and gather evidence to prosecute plaintiff; and (3) the methods of interrogation, although grossly inappropriate, were incidental to their employment.

Despite the strong support of plaintiff's position in the case law of Seventh Circuit, the City cites several opinions to argue that due to the extreme violent and illegal nature of the Officers' conduct, a reasonable jury could conclude that the Officers acted outside the scope of their employment because the Officers: (1) acted in an outrageous manner; and (2) their actions constituted a crime.[2] Unfortunately for the City, the cases it relies upon are inapplicable because, unlike the instant case, they involve either police officers acting as private citizens while off-duty or non-police employees.

In *Sunseri v. Puccia*, 97 Ill.App.3d 488, 52 Ill.Dec. 716, 422 N.E.2d 925 (1st Dist.1981), a bartender attacked and bit off the ear of a patron outside his place of employment. The court reversed a directed verdict for the defendant employer on the ground that a reasonable jury could have ruled the employee was acting within the scope of employment. *Id.* In the instant case the City, citing *Sunseri*, argues that the police "inflicted a punishment out of proportion to the necessities of (their) employer's business," and therefore a jury should decide if the Officers acted outside the scope of their employment. *Id.* This argument, however, is flawed, because the facts in *Sunseri* are easily distinguishable from the facts of the instant case. Further, the Officers meet the relevant scope of employment test set forth in *Sunseri*: (1) whether the acts fall within the authorized time and location of the employment; and (2) whether the conduct was

motivated, at least in part, to further the purpose of the employer's business. 52 Ill. Dec. at 721, 422 N.E.2d at 930. Here, the misconduct of the police, at least in part, was actuated by their motivation to obtain a confession for their employer (the City) and occurred within the authorized time and location of their employment—while on duty and at the police station.

Additionally, the City argues that the Officers went beyond their scope of employment because their actions constituted a crime that was not authorized by the City. In *Gambling v. Cornish*, 426 F.Supp 1153, 1154–55 (N.D.Ill.1977), the court held, on a motion for summary judgment, that the actions of two police officers in falsely arresting and sexually assaulting the plaintiff were outside the scope of employment as a matter of law, even though the officer's status as a policeman enabled him to commit the assault. The court used the "personal motivation test," adopted from the Restatement (Second) of Agency § 245 (1958), Comment (f), which states that "the liability of a master for the use of force by a servant is not prevented by the fact that the servant acts in part because of a personal motive such as revenge. The master, however, is relieved from liability under this section if the servant has no intent to act on his master's behalf...." *Id.* at 1155. The court's holding was based on the fact that the officers did not intend to further the city's needs but were instead motivated by their own personal gratification. *Id.* In the instant case, even if the Officers were motivated by revenge, they still were serving the needs of their employer by eliciting a confession, and therefore, pursuant to the Restatement (Second) of Agency § 245 (1958), Comment (f) and Illinois case law, they acted within the scope of their employment.

In summation, the facts of the instant case: (1) are clearly distinguishable from the cases cited by the City; and (2) support the granting of summary judgment pursuant to both Illinois and Seventh Circuit case law. The

---

**2.** See *Pyne v. Witmer*, 129 Ill.2d 351, 135 Ill.Dec. 557, 543 N.E.2d 1304 (1989); *Sunseri v. Puccia*, 97 Ill.App.3d 488, 52 Ill.Dec. 716, 422 N.E.2d 925 (1st Dist.1981); *McDonnell v. City of Chica-*

go, 102 Ill.App.3d 578, 58 Ill.Dec. 227, 430 N.E.2d 169; *Luna v. Meinke*, 844 F.Supp 1284 (N.D.Ill1994), aff'd, 42 F.3d 1391 (7th Circuit 1994).

City admits that the Officers in the course of an official police investigation, while on duty, in uniform, and at their place of employment, physically abused plaintiff while in police custody. The purpose of the beating significantly served their employer's objective—to elicit a confession to the shooting of two Chicago police officers. Both the Officers and the City intended the confession to aid in the investigation and prosecution of plaintiff. The interrogation methods used, although inappropriate, were incidental to the Officers' regularly sanctioned duties.

Police use various interrogation techniques (usually legal, but sometimes illegal) to fulfill their job requirements—to arrest and gather evidence leading to the prosecution of criminal suspects. Therefore, the Officers' actions, although malicious and not sanctioned by the City, occurred within the scope of their employment because it was a "natural part of or incident to the service of their employment" that they performed while on duty, acting as Chicago police and not private individuals. *Coleman*, 814 F.2d at 1149. Additionally, the Officers, even if they were motivated by revenge, were also motivated by their desire to fulfill the City's objectives—to make an arrest and elicit a confession from plaintiff. Given this dual motivation, the Officers' misconduct undoubtedly falls within the scope of their employment. *See Graham*, 915 F.2d at 1095; *Hibma*, 769 F.2d at 1153; *Coleman*, 814 F.2d at 1150; *Bell*, 536 F.Supp. at 477.

Finally, the City argues that public policy compels a finding that the Officers acted outside the scope of their employment. Sound public policy, according to the City, should prevent police officers from exceeding their authority. The City claims that holding such extreme conduct within the scope of employment will only punish innocent taxpayers.

This argument, however, like the previous arguments, lacks merit. The conduct of the Officers was incidental to their regular police duties and occurred inside a police station. By placing liability upon the employer, the burden is on the City to deter and take corrective measures to prevent police abuse. The City, after all, is in the best position to prevent such misconduct.

### CONCLUSION

For the reasons stated above, the City's motion for reconsideration is denied. Plaintiff's motion to strike the City's second affirmative defense is granted. Plaintiff's motion for summary judgment against the City on Count I is granted, and plaintiff's motion for summary judgment against the Officers on Count I is granted but stayed.